# 22-3182

## In the United States Court of Appeals

### FOR THE SECOND CIRCUIT

TERESA POOR,* Regional Director of Region 29
of the National Labor Relations Board for and on behalf
of the NATIONAL LABOR RELATIONS BOARD

*Petitioner-Appellee*,

v.

AMAZON.COM SERVICES LLC,

*Respondent-Appellant*.

On Appeal from the United States District Court
for the Eastern District of New York,
No. 1:22-cv-01479, Hon. Diane Gujarati

## BRIEF FOR PETITIONER-APPELLEE
## NATIONAL LABOR RELATIONS BOARD

JENNIFER A. ABRUZZO
General Counsel

RICHARD J. LUSSIER
Act. Dep. Asoc. Gen. Counsel

PETER SUNG OHR
Dep. General Counsel

LAURA T. VAZQUEZ
Dep. Asst. General Counsel

RICHARD A. BOCK
Asoc. General Counsel

CHAD A. WALLACE
Attorney

National Labor Relations Board
1015 Half Street, Southeast
Washington, DC 20570
202-273-2489

*Counsel for Petitioner-Appellee*

*The original Petitioner, Kathy Drew King, is no longer the Regional Director for Region 29 of the National Labor Relations Board.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION......................................................................................1

COUNTERSTATEMENT OF THE ISSUES..............................................1

COUNTERSTATEMENT OF THE CASE.................................................3

    A.    Procedural History.......................................................................4

    B.    Background: Amazon's JFK8 Operations and the COVID-19 Pandemic....5

    C.    Bryson and Other Employees Band Together to Demand Safer Working Conditions ..................................................................5

    D.    Bryson Leads Another Employee Protest and is Provoked into a Verbal Altercation with a Co-Worker .............................................7

    E.    Amazon Seized on the April 6 Verbal Altercation to Discharge Bryson After Conducting a Sham Investigation................................9

    F.    Amazon Treated Bryson More Harshly Than Other Employees...............10

    G.    Bryson's Termination Negatively Impacts Employees' Willingness to Openly Engage in Protected Concerted Activities .............................................11

    H.    The ALU Wins the Election at JFK8 But With Low Employee Turnout...13

    I.    The ALJ Finds Amazon Unlawfully Terminated Bryson..........................13

    J.    The District Court Enjoins Amazon from Similar Future Violations but Concludes that Immediate Interim Reinstatement of Bryson is Unwarranted....14

i

SUMMARY OF THE ARGUMENT .......................................................16

ARGUMENT ..........................................................................................18

    A.    Standard of Appellate Review.......................................................18

    B.    The Applicable §10(j) Standards....................................................18

        1.    The "reasonable cause" standard ..........................................19

        2.    The "just and proper" standard .............................................21

    C.    The District Court Correctly Found There Was Reasonable Cause to Believe Amazon Violated § 8(a)(1) of the Act by Discharging Bryson and that the Board Will Issue a Cease-and-Desist Order ....................................................22

    D.    The District Court Properly Concluded that an Interim Cease-and-Desist Order was Just and Proper ................................................................25

        1.    The district court's interim cease-and-desist order is well-supported by the record and case law ....................................................25

        2.    Cease-and-desist orders are a standard part of § 10(j) injunctions......31

        3.    The district court's rationale for denying interim reinstatement to Bryson does not weigh against the cease-and-desist order.............................34

    E.    The District Court's Order Complies with Rule 65(d) ..............................37

        1.    The order is sufficiently specific and Amazon can reasonably anticipate from the order what conduct has been enjoined............................37

        2.    Amazon misconstrues Rule 65(d) in the context of § 10(j) proceedings ....................................................................41

CONCLUSION ......................................................................................45

ADDENDUM ..................................................................................... A-1

# TABLE OF AUTHORITIES

**Federal Cases**

*Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575 (2d Cir. 1988).......................23

*Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226 (6th Cir. 2003) ...............................21

*Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967) .........................................................30

*Asseo v. Pan Am. Grain Co.*, 805 F.2d 23 (1st Cir. 1986).......................................30

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) ............. 20, 21, 26

*Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir. 1975).......................39

*Bozzuto's Inc. v. NLRB*, 927 F.3d 672 (2d Cir. 2019) ...................................... 22, 23

*Chromalloy Gas Turbine Corp.*, 331 NLRB 858 (2000).........................................40

*City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011).... 18, 37, 40

*Danielson v. Joint Bd. of Coat, S. & A.G. Workers' Union*, 494 F.2d 1230 (2d Cir. 1974)..................................................................................................................20

*Diaz v. Hartman & Tyner, Inc.*, 2012 U.S. Dist. LEXIS 92459 (S.D. Fla. June 29, 2012)..................................................................................................................34

*Electrolux Home Products*, 368 NLRB No. 34 (2019) ...........................................23

*Fernbach v. Arbor Recycling & Arbor Logistics*, 2017 U.S. Dist. LEXIS 158111 (S.D.N.Y. Sept. 26, 2017) ...................................................................................34

*Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011) ................................ 27, 29, 30

*Garner v. MacClenny Prods.*, 859 F. Supp. 1478 (M.D. Fla. 1994).......................35

*Gottfried v. Frankel*, 818 F.2d 485 (6th Cir. 1987) .................................................33

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001)............ passim

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64 (1967) ....41

*Johansen v. Queen Mary Rest. Corp.*, 522 F.2d 6 (9th Cir. 1975).........................44

*John B. Hull, Inc. v. Waterbury Petrol. Prods., Inc.*, 588 F.2d 24 (2d Cir. 1978) ..40

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980) .............................. 19, 20, 21

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980) .................... passim

*Kerwin v. Starbucks Corp.*, 2023 U.S. Dist. LEXIS 36784 (E.D. Mich. Mar. 6, 2023)................................................................................................. 31, 42, 44

*Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131 (2d Cir. 2013) ...... 19, 21, 43

*Ley v. Novelis Corp.*, 2014 U.S. Dist. LEXIS 123059 (N.D.N.Y. Sept. 4, 2014)...34

*Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249 (D.N.J. 1992)........................35

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008) .............. 18, 39

*Lion Elastomers LLC*, 372 NLRB No. 83 (2023)....................................................25

*Matsu Corp. d/b/a Matsu Sushi Restaurant*, 368 NLRB No. 16 (2019) ................32

*Mattina v. Kingsbridge Heights Rehab. & Care Ctr.*, 2008 U.S. Dist. LEXIS 63029 (S.D.N.Y. Aug. 14, 2008) ...........................................................................40

*McLeod v. Bus. Mach., etc., Conf. Bd.*, 300 F.2d 237 (2d Cir. 1962) .....................19

*Morio v. N. Am. Soccer League*, 632 F.2d 217 (2d Cir. 1980).................. 31, 32, 44

*Motion Picture Studio Mechanics, Local 52*, 238 NLRB 19 (1978).......................40

*Motion Picture Studio Mechs., Local 52 v. NLRB*, 593 F.2d 197 (2d Cir. 1979)................................................................................................ 33, 39

*Murphy v. Hogan Transps., Inc.*, 581 F. App'x 36 (2d Cir. 2014).................. 26, 27

*NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964) .................................................24

*NLRB v. Caval Tool Div., Chromalloy Gas Turbine Corp.*, 262 F.3d 184 (2d Cir. 2001)........................................................................................................................40

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996) ................ 20, 27, 29, 42

*NLRB v. Express Publ'g Co.*, 312 U.S. 426 (1941).................................... 33, 37, 39

*NLRB v. G&T Terminal Packaging Co.*, 246 F.3d 103 (2d Cir. 2001)............ 33, 37

*NLRB v. Hosp. San Rafael*, 42 F.3d 45 (1st Cir. 1994) .................................... 33, 37

*NLRB v. Int'l Bhd. of Teamsters*, 428 F.2d 994 (2d Cir. 1970)..............................33

*NLRB v. Jam. Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980) .....................................26

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ...................................25

*NLRB v. Matsu Corp.*, 819 F. App'x 56 (2d Cir. 2020) ..........................................32

*NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) ...................................... 22, 23

*Overstreet v. Shamrock Foods Co.,* 679 F. App'x 561 (9th Cir. 2017)..................29

*Pascarell v. Candler Coffee Corp.*, 1996 U.S. Dist. LEXIS 21748 (D.N.J. July 17, 1996)...............................................................................................................34

*Paulsen v. PrimeFlight Aviation Servs.*, 718 F. App'x 42 (2d Cir. 2017) ....... 31, 38

*Paulsen v. Remington Lodging & Hosp., LLC*, 2013 U.S. Dist. LEXIS 114628 (E.D.N.Y. Aug. 14, 2013) ...................................................................................28

*Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462 (2d Cir. 2014) .. 27, 29

*Peregrine Myan. v. Segal*, 89 F.3d 41 (2d Cir. 1996)....................................... 40, 41

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001) .................................... 26, 27

*Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013 (1st Cir. 1995)...................37

*Schaub v. W. Mich. Plumbing & Heating, Inc.,* 250 F.3d 962 (6th Cir. 2001)............................................................................... 26, 27, 28, 33

*Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652 (9th Cir. 2001)..................... 31, 38

*Sears, Roebuck & Co. v. Carpet, L., S.T. & R.F.C. Layers*, 397 U.S. 655 (1970)..44

*Seeler v. Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975) ............................... passim

*Sharp v. Webco Indus.*, 225 F.3d 1130 (10th Cir. 2000) ........................................27

*Silverman v. J.R.L. Food Corp.*, 196 F.3d 334 (2d Cir. 1999) ....................... passim

*Silverman v. Major League Baseball Player Relations Comm.*, 67 F.3d 1054 (2d Cir. 1995) ...........................................................................................................20

*Silverman v. Major League Baseball Player Relations Comm.*, 880 F. Supp. 246 (S.D.N.Y. 1995) ...............................................................................21

*Silverman v. Whittall & Shon, Inc.*, 1986 U.S. Dist. LEXIS 24528 (S.D.N.Y. June 6, 1986) ..............................................................................................28

*Swift & Co. v. United States*, 196 U.S. 375 (1905)....................................................40

*Szabo v. U.S. Marine Corp.*, 819 F.2d 714 (7th Cir. 1987) ......................................42

*U.S. Steel Corp. v. United Mine Workers of Am.*, 534 F.2d 1063 (3d Cir. 1976) ...42

*Wright Line*, 251 NLRB 1083 (1980)......................................................................22

**Federal Statutes**

28 U.S.C § 1292(a)(1).................................................................................................1

28 U.S.C. § 1291 ........................................................................................................1

29 U.S.C. § 157 ..........................................................................................................2

29 U.S.C. § 158(a)(1)..................................................................................................4

29 U.S.C. § 160(c) ....................................................................................................31

29 U.S.C. § 160(j) .................................................................................................1, 18

**Other Authorities**

Fed. R. Civ. P. 65(d) .............................................................................. 2, 18, 37, 41

*Legislative History of the Labor-Management Relations Act, 1947 Volume I* (1985) .........................................................................................19

## COUNTERSTATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction under 29 U.S.C. § 160(j) ("§ 10(j)"), of the National Labor Relations Act ("the Act").[1] The court below entered its order granting a temporary injunction on November 18, 2022. Respondent-Appellant Amazon.com Services, LLC ("Amazon") filed its timely notice of appeal on December 19, 2022. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## COUNTERSTATEMENT OF THE ISSUES

This case is based on allegations by Teresa Poor, Regional Director ("the Director") of Region 29 of the National Labor Relations Board ("NLRB" or "the Board") for and on behalf of the Board, that Amazon discharged an employee activist in violation of the Act to chill employees' willingness to engage in statutorily protected activities. The district court found reasonable cause to believe that Amazon committed the alleged violation, relying on evidence in the administrative record and the decision of a Board Administrative Law Judge ("ALJ"). Amazon does not challenge the district court's reasonable cause finding. The district court issued an injunction under § 10(j) that ordered Amazon to cease

---

[1] See the attached Addendum for the text of §10(j) and other relevant sections of the Act.

1

and desist from discharging employees for their protected concerted activity or in any like or related manner coercing employees in the exercise of their rights under the Act. This appeal raises the following issues:

1. The district court concluded that a cease-and-desist order was warranted to give employees assurances that their rights under the Act will be protected and to preserve the lawful status quo. The record establishes strong cause to believe that Amazon discriminatorily discharged an employee for protected activities and that the discharge had some adverse impact on employees. Relevant case law recognizes that adverse impact is the predictable effect of discriminatory terminations. In these circumstances, did the court correctly exercise its discretion by enjoining similar future violations to prevent irreparable harm to employees' rights and maintain the lawful status quo pending final adjudication by the Board?

2. Fed. R. Civ. P. 65(d) ("Rule 65(d)") requires injunctions to be sufficiently specific and definite so that those within its scope are notified of the proscribed conduct. The district court ordered Amazon to, inter alia, cease and desist from terminating employees for engaging in protected concerted activities and in any like or related manner interfering with employees' rights guaranteed by § 7 of the Act, 29 U.S.C. § 157. Does the court's cease-and-desist order comply with the specificity requirement of Rule 65(d)?

2

## COUNTERSTATEMENT OF THE CASE

Immediately upon learning that employee Gerald Bryson ("Bryson") was a leader among a group of employees at Amazon's JFK8 warehouse, who sought to secure life-or-death safety protections amid the emerging COVID-19 pandemic, Amazon staged a sham termination in retaliation for his protected concerted activities. Bryson's termination impacted employees' willingness to openly engage in concerted activities. Although enough employees signed authorization cards to support the processing of a union petition for a secret-ballot election, and a majority of the employees who voted in the election chose the Amazon Labor Union ("ALU" or "the Union") as their representative, employees were afraid to *openly* support the ALU, citing Bryson's termination. Despite the Union's win over a year ago, Amazon continues to contest the validity of the election results and has refused to bargain with the Union. Absent the district court's order enjoining Amazon from further violating the Act, Amazon will achieve its unlawful goal, through illegal means, of crushing employees' rights under § 7 of the Act to engage in protected concerted activities and openly support a union of their choosing. Amazon's unlawful conduct necessitates interim relief to preserve employees' rights, to effectuate the Congressional policies of the Act, and to prevent remedial failure.

3

## A. Procedural History

This case is before the Court on an appeal by Amazon from an order of the United States District Court for the Eastern District of New York, by Judge Diane Gujarati, granting in part and denying in part the petition, filed by the Director, for a temporary injunction under § 10(j) of the Act. (A119.)[2]

On March 17, 2022, the Director petitioned for temporary injunctive relief pending completion of the Board's administrative proceedings against Amazon. (A13.) The petition was predicated on an unfair-labor-practice complaint issued on December 22, 2020. (ECF No. 1-2.) The petition alleged, inter alia, that there is reasonable cause to believe that the Director will establish before the Board that Amazon violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by terminating Bryson for engaging in concerted activities protected by the Act. The petition, amended on July 8, 2022 after court-ordered discovery, sought interim relief, including an order that Amazon offer reinstatement to Bryson and cease and desist from terminating employees for engaging in protected concerted activity, pending the Board's resolution of the administrative complaint. (A18–19, A89–90.)

---

[2] Hereinafter, references to the parties' joint appendix will be presented as "A[Page No.]." References to Amazon's opening brief will be presented as "Br. [Page No.]." References to the district court's electronic case file will be presented as "ECF No. [Docket No.] at [Page No.]."

**B. Background: Amazon's JFK8 Operations and the COVID-19 Pandemic**

Amazon operates a fulfillment center, designated as "JFK8," in Staten Island, New York. (A54.) By late March 2020, New York City was the epicenter of the COVID-19 pandemic. Most businesses in the city closed because of the rise in COVID cases, but Amazon's massive JFK8 facility remained open. Amazon employees at JFK8 were deemed "essential workers," whose jobs could only be performed in person. Despite the grave health risks faced while working at the height of the pandemic, Amazon did not provide its employees with face masks or other personal protective equipment such as gloves, face shields, eye coverings, hand sanitizer, or disinfecting wipes. (ECF No. 5, Exh. E, Transcript pp. 620–22, 625–26 (hereinafter "Tr. [Page No.]").) Amazon did not upgrade its air filtration system, did not deep clean the facility, nor did it make significant changes for appropriate cleaning of JFK8 in light of the major health risk. (Tr. 631–32.) Fearful for their health and safety and that of their families, JFK8 employees joined together to find ways to mitigate the unsafe working conditions and discuss whether, without changes, they should be at work at all. (A54; Tr. 633–34.)

**C. Bryson and Other Employees Band Together to Demand Safer Working Conditions**

Bryson began working at JFK8 in September 2018 and worked alongside employees Christian Smalls ("Smalls") and Derrick Palmer ("Palmer"). (A54.) Bryson and others were among the employees who had significant safety concerns

5

about Amazon's response to the pandemic. (A54.) On March 25, 2020, while off the clock, Bryson, Smalls, and others led a group of employees into the general manager's office at JFK8 to protest Amazon's failure to protect employees from COVID-19 while working at the facility. (A54.) Employees protested working without proper protection, including masks, and requested that Amazon temporarily shut down the JFK8 facility for proper cleaning, as it had done for another New York City-area facility. (A54.) The managers' only response was a claim they were doing "everything we can" and they refused to shut down the facility for cleaning. (A54; Tr. 652–53.)

Dissatisfied with management's response, Bryson and others organized a walk-out and public protest on March 30, 2020, to reiterate their demands. (A54.) Bryson's primary role in the March 30 protest was to speak to the media. (Tr. 671–72.) Bryson was pictured and quoted in various news publications and appeared on a local television news broadcast. (ECF No. 5-6 at 660–64.)

Immediately after the March 30 protest, Amazon fired Smalls, who, up until that time, had been leading the employee protest movement. (A54; Tr. 672.) After Smalls' termination, Bryson became the in-house de facto leader of the protest movement. (Tr. 1023.)[3]

---

[3] Smalls did not file a charge with the Board following his termination.

**D. Bryson Leads Another Employee Protest and is Provoked into a Verbal Altercation with a Co-Worker**

Bryson and other employees planned their next protest for April 6, 2020, to continue to press their shared COVID-19 safety concerns and to protest Amazon's retaliatory discharge of Smalls. (A55; Tr. 686–87.) Bryson and the employees who participated did so on their own time. (A55.) During the event, Bryson, using a bullhorn, and co-worker Mandi Velasco protested together in the parking lot about 75 to 100 feet from the main entrance to the JFK8 facility. (Tr. 860, 1025, 1029.) With his bullhorn, Bryson expressed concerns about the infection rate and the need to clean JFK8. (Tr. 1029–30.) Velasco filmed and broadcast video of the protest via Facebook Live. (A55.)

While Bryson was protesting, he heard a woman, whom he could not see, shout at him, "Why don't you get the fuck out of here."[4] (Tr. 1030.) Bryson ignored the initial jeer. A moment later, Bryson heard the same voice call out, "They ain't going to shut it down! This is the only fucking job open, so appreciate it!" (A55, A77.) Bryson responded, "We don't have to appreciate something where we could bring something home to our families." (A77.) The woman responded, "Go home! Just go home!" and "No one is going to listen to you so just go home."

---

[4] At the administrative hearing Bryson consistently testified on direct and cross examination that the woman's initial statement of, "Why don't you get the fuck out of here?" was not captured by the audio recording from Velasco's video, even though Bryson heard it. (Tr. 1160, 1163.)

7

(A77.) Bryson then located the woman who was harassing him—Dimitra Evans, a warehouse worker at JFK8 who was on her break at the time—and the two employees proceeded to argue. (A55.) Evans, who is White, escalated the conflict with a racist comment, telling Bryson, who is Black, to "Go back where you came from! Go back to the Bronx!" (A58 n.10, A77). Bryson was stunned and "devastated" by Evans' racist attack. (Tr. 1033–34.) Bryson replied, "Go back to the Bronx? I'm from right here. I'm sorry. Sorry gutter bitch." (A77.) The two employees continued to trade insults. (A77–78.) Although Bryson made some distasteful statements, Evans was unfazed, responding in equally distasteful and even hostile terms. At one point, Evans tried to escalate the encounter to a physical conflict, saying "if you want to bring it, I'll bring it on too," which Bryson brushed off. (A77.) Bryson understood the remark "bring it" as an invitation for a physical fight. (Tr. 1040.) Later during the exchange, Evans again tried to incite violence, taunting Bryson to "make me shut up." (A78.) Bryson understood Evans' statement, "make me shut up," as provocation for a physical fight, which he declined. (Tr. 1039.) The argument ended after Evans went inside the facility and stopped engaging with Bryson. (A79.)

8

**E. Amazon Seized on the April 6 Verbal Altercation to Discharge Bryson After Conducting a Sham Investigation**

Following the verbal altercation, Bryson moved to a different location to continue the protest and Evans returned to work and carried on with her day; neither employee reported the incident to Amazon or otherwise complained to management about the other's conduct. (A55.) An operations manager, who purportedly witnessed Bryson and Evans arguing, reported it to the JFK8 general manager, who then suggested that Human Resources investigate. (A55.)

Amazon approached Evans about the incident, who referred management to three employee witnesses. (A55.) Amazon also reviewed two soundless video recordings of the incident and identified another witness. (A55.) Amazon then obtained statements from Evans and the four witnesses who claimed to have seen the interaction between her and Bryson along with a statement from a security supervisor. (A55.) The witness statements were one-sided, riddled with inaccuracies and inconsistencies, and results-oriented, referencing cursing and antagonistic comments by Bryson, but not by Evans. (A55.) Amazon did not attempt to resolve the blatant inconsistencies. (A55.) In particular, Amazon did not interview Bryson's fellow protester, Mandi Velasco, who Amazon had identified as protesting with Bryson, was the closest witness, and who recorded the entire exchange using her cell phone. (A68.) When Amazon did eventually interview

9

Bryson about the incident on April 10, Amazon managers had already drafted his termination notice prior to the interview. (A57–58.)

On April 17, 2020, Amazon terminated Bryson for the April 6 incident with Evans. The termination notice stated that Bryson was fired because he committed a "Category 2" violation of company policy by making "vulgar and derogatory comments towards another employee." (A59.) Although Amazon concluded that Evans had also committed a "Category 2" violation by using "inappropriate language" during the argument, Amazon issued Evans only a first written warning. (A59.)

### F. Amazon Treated Bryson More Harshly Than Other Employees

According to Amazon's disciplinary records, there were numerous situations where employees were handed lesser discipline than discharge for similar and, in some instances, more serious conduct than what led to Bryson's termination. (A60.) For example (A60–61):

- First written warning for "bumping past a fellow associate" while calling the associate a "bitch" and telling her to "shut the fuck up;"

- Final written warning for category 1 security infraction of bringing a weapon to work;

- First written warning for sexual contact without consent;

10

- First written warning where employee told an area manager she wanted to "rip off her mouth" and "punch her;"

- First written warning for "using inappropriate and profane language towards another associate in a manner that created a hostile work environment;"

- Final written warning for "using curse words and creating hostile work environment" in "using inappropriate language while talking to another associate;"

- Final written warning for "verbal threats" to another employee;

- Final written warning for engaging in a "work place violence incident;"

- Final written warning for "threaten[ing]" an employee "to see him outside . . . which falls under Amazon Workplace Violence standard of conduct."

There is no evidence of Amazon issuing discipline for, like here, employee conduct that occurred outside the facility during non-working time. (A61.)

### G. Bryson's Termination Negatively Impacts Employees' Willingness to Openly Engage in Protected Concerted Activities

After his termination, Bryson remained active with organizing employees around COVID-19 and other safety issues. Bryson, along with Smalls and Palmer, founded the Congress of Essential Workers (TCOEW). (A30.) TCOEW engaged in

11

general strikes in support of other essential workers outside of JFK8, including the Amazon workers fighting for a union in Bessemer, Alabama. (A30.) Bryson's termination continued to be widely known to JFK8 employees because Bryson was a central figure in the protests in March and April 2020, was popular among co-workers at JFK8, and has a deep connection with the Staten Island community. (A47, A103, A106.)

Around April 2021, about a year after Bryson's termination, Bryson helped form the Amazon Labor Union. (A22, A46, A94.) At its inception, the ALU set up a tent and table next to a bus stop outside of the JFK8 parking lot to distribute Union literature, ALU-branded t-shirts and masks, and authorization cards for interested employees to sign so the Union could petition the Board for a representation election. (A22–23, A30–31, A40.) In late 2021, the ALU filed an election petition with the Board seeking to represent JFK8's hourly employees; an election was scheduled for March 2022. (A46.)

Bryson was present at the ALU tent almost every day from April 2021 until the election in March 2022, talking to employees and encouraging them to support the Union. (A100, A116.) But since the founding of the ALU, Bryson and other Union organizers have fielded concerns from employees that they might be terminated like Bryson for signing Union authorization cards or openly showing their support for the Union. (A25–26, A40, A47–48, A103, A105, A107, A115–16,

A118.) Despite the Union's encouragement to wear ALU-branded t-shirts and masks, many employees refused to wear them or otherwise openly support the Union because they were afraid of retaliation by Amazon. (A30–31, A40, A96, A107.) Employees also questioned whether it was safe to be seen talking to or otherwise associating with Bryson. (A107.)

### H. The ALU Wins the Election at JFK8 But With Low Employee Turnout

On April 1, 2022, the tally of ballots showed that the ALU won the election at JFK8, although only 4,852 employees out of a unit of 8,325, or approximately 58%, participated in the election. (ECF No. 48, at 5 n.21.) Amazon has refused to recognize or bargain with the ALU while it continues to contest the election's results.

### I. The ALJ Finds Amazon Unlawfully Terminated Bryson

On April 18, 2022, ALJ Benjamin W. Green issued his decision in the Board's administrative case finding Amazon violated the Act as alleged. (A52.) The ALJ concluded that Amazon conducted a sham investigation of the Bryson-Evans incident by soliciting "exaggerated accounts" and otherwise "engaging in an ostrich-like, head in the ground, investigation that seeks to avoid evidence which might disclose information mitigating the employee's misconduct." (A55 n.7, A68.) The ALJ analyzed Amazon's termination of Bryson under two legal theories and found Amazon acted unlawfully under either analysis. (A67–71.) Specifically,

13

the ALJ stated there was "considerable evidence" that Amazon's stated reason for Bryson's discharge "was mere pretext for its true discriminatory motive," noting, among others, that Amazon's investigation was skewed and designed to blame only Bryson for the April 6 incident and that Amazon treated Bryson more harshly than other employees who engaged in similar or worse conduct. (A71.) The ALJ's recommended order to the Board included provisions requiring Amazon to: (1) "[c]ease and desist from (a) Discharging employees because of their protected concerted activity. (b) In any like or related manner interfering, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act;" and (2) "offer Gerald Bryson reinstatement to his former position[.]" (A73.)

### J. The District Court Enjoins Amazon from Similar Future Violations but Concludes that Immediate Interim Reinstatement of Bryson is Unwarranted

On November 18, 2022, the district court issued its decision and order, granting the Board's amended § 10(j) petition in part by issuing an interim cease-and-desist order and ordering posting and reading remedies. The court, however, denied an order requiring Bryson's interim reinstatement. (A121.) The court concluded that there was reasonable cause to believe Amazon unlawfully terminated Bryson for protected concerted activity. (A134–38.) In reaching its conclusion, the district court noted that the record evidence, along with this

14

Circuit's required deference, "amply support[ed]" the Director's position that
Bryson was engaged in protected activity, the activity was a motivating factor in
Amazon's decision to terminate Bryson, and Amazon's stated reasons for his
termination were pretextual. (A136.) The court further noted that the ALJ's
decision confirmed its reasonable cause finding. (A136.) The court soundly
rejected, as contrary to this Circuit's precedent, Amazon's argument that deference
to the Director's position and the ALJ's decision were inappropriate. (A137–38.)

Next, the district court concluded, in light of its reasonable cause finding and
based on the record before it, that a cease-and-desist order, enjoining Amazon from
terminating employees for their protected concerted activities, was just and proper.
(A139–40.) The court specifically ordered Amazon to, "(1) [c]ease and desist
from: (a) [d]ischarging employees because they engaged in protected concerted
activity; and (b) [i]n any like or related manner interfering with, restraining, or
coercing employees in the exercise of the rights guaranteed to them by Section 7 of
the [Act]." (A146.)[5] The court concluded that the cease-and-desist order would
give employees assurances that their rights will be protected and that it will prevent
Amazon from further undermining any employee organizing or bargaining efforts.
(A140.) The order also directed Amazon to post, distribute, and read the court's

_____

[5] The Director did not seek a nationwide cease-and-desist order and the Board's
position on the district court's order is that it applies only to Amazon's JFK8
facility.

order to employees so that they will be assured that Amazon will refrain from engaging in further similar unfair labor practices. (A140, A146–47.)

Finally, the court determined that "Bryson-specific affirmative relief"—i.e., interim reinstatement—would not be just and proper. (A140–45.) Noting "the unique circumstances of this case," the district court found there was insufficient evidence to demonstrate that Bryson's termination continues to have an "appreciable effect" on Union efforts or employees' willingness to engage in protected activity that would warrant Bryson's interim reinstatement. (A142.) The court further explained that the record before it failed to support a conclusion that Bryson's continued absence would irreparably harm employee rights. (A143–44.)

## SUMMARY OF THE ARGUMENT

The Director satisfied this Court's standard for § 10(j) relief. The district court correctly concluded, and Amazon does not contest, that there is reasonable cause to believe Amazon violated the Act as alleged. The court also correctly concluded that interim relief enjoining similar future violations is "just and proper." Although the court declined to order interim reinstatement for Bryson, the court's issuance of a cease-and-desist order was warranted based upon record evidence and applicable law. The Second Circuit and other courts have recognized that terminating an employee for engaging in protected concerted activity is a hallmark violation of the Act that is highly coercive and tends to chill employees'

16

concerted activities, absent interim relief. Record evidence showed Bryson's termination caused employees to fear openly engaging in protected concerted activities. Thus, the court's conclusion that an order enjoining discriminatory discharges is warranted to reassure employees of their statutory rights and is supported by the record and case law. The district court also found an interim order would maintain the lawful status quo, which is one of this Court's "just and proper" considerations under § 10(j). The district court's conclusion that there was insufficient evidence to warrant Bryson's interim reinstatement does not foreclose the appropriateness of a cease-and-desist order because courts often weigh just and proper evidence differently based on the type of relief sought. Further, although the court found there was no pressing need for Bryson's reinstatement, this does not establish that similar future violations would not risk irreparable harm to employee rights. Therefore, the court properly exercised its discretion by enjoining future unlawful conduct despite denying interim reinstatement.

The district court's order complies with Rule 65(d) because it is sufficiently specific and Amazon can reasonably anticipate from the order what conduct is enjoined. The order is not simply an "obey the law" order; it is tailored to the violation that the district court found in its reasonable cause analysis. Rule 65(d) requires only that acts restrained are described in reasonable detail and leaves

17

ample room for applying common sense standards by using familiar terms that implicitly incorporate labor law principles developed by the Board and courts.

## ARGUMENT

### A. Standard of Appellate Review

This Court reviews a district court's determination of whether relief was just and proper for abuse of discretion. *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364 (2d Cir. 2001). This Court reviews de novo whether the injunction complied with Rule 65(d). *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011). *See Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 503–04 (7th Cir. 2008) (although circuit courts review decision to grant injunction for abuse of discretion, conformity with Rule 65(d) is a question of law reviewed without deference).

### B. The Applicable §10(j) Standards

Section 10(j) authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair-labor-practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render ineffective a final Board order. *See Kaynard v. Palby Lingerie, Inc*., 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38

18

(2d Cir. 1975) (citing *S. Rep. No. 105, 80th Cong., 1st Sess.*, at 8, 27 (1947),

*reprinted in Legislative History of the Labor-Management Relations Act, 1947*

*Volume I*, at 414, 433 (1985)). Thus, § 10(j) was intended to prevent the potential

frustration or nullification of the Board's remedial authority caused by the passage

of time inherent in Board administrative litigation. *See, e.g., Seeler*, 517 F.2d at

37–38.

To resolve a § 10(j) petition, a district court in the Second Circuit considers

whether there is "reasonable cause to believe" that a respondent has violated the

Act, and whether temporary injunctive relief is "just and proper" under the

circumstances. *See, e.g.*, *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131,

141–42 (2d Cir. 2013); *Hoffman*, 247 F.3d at 364–65; *Silverman v. J.R.L. Food

Corp.*, 196 F.3d 334, 335 (2d Cir. 1999).

### 1.  The "reasonable cause" standard

In determining whether there is reasonable cause to believe that the Act has

been violated, a district court should not decide the merits of the case. *See

Hoffman*, 247 F.3d at 365; *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1032–33 (2d

Cir. 1980). Rather, the court's role is limited to determining whether there is

"reasonable cause to believe that a Board decision finding an unfair labor practice

will be enforced by a Court of Appeals." *Mego Corp.*, 633 F.2d at 1033 (quoting

*McLeod v. Bus. Mach., etc., Conf. Bd.*, 300 F.2d 237, 242 n.17 (2d Cir. 1962)).

District courts hearing § 10(j) injunction petitions are not to resolve contested factual issues. *See Palby Lingerie*, 625 F.2d at 1051–52 & n.5. *See also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570–71 (7th Cir. 1996). Instead, the Director's version of the facts "should be given the benefit of the doubt," *Seeler*, 517 F.2d at 37, and, together with the inferences therefrom, "should be sustained if within the range of rationality." *Mego Corp*., 633 F.2d at 1031. *See also J.R.L. Food Corp.*, 196 F.3d at 335.

Similarly, on questions of law, the district court "should be hospitable to the views of the [Director], however novel." *Mego Corp*., 633 F.2d at 1031 (quoting *Danielson v. Joint Bd. of Coat, S. & A.G. Workers' Union*, 494 F.2d 1230, 1245 (2d Cir. 1974)). The Director's legal position should be sustained "unless the [district] court is convinced that it is wrong." *Palby Lingerie*, 625 F.2d at 1051. In sum "[a]ppropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm.*, 67 F.3d 1054, 1059 (2d Cir. 1995).

The ALJ's findings and legal conclusions in the underlying administrative case supply "a useful benchmark" against which to weigh the strength of the Director's theories of violation. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001). The "preponderance of the evidence" standard applied by the

20

ALJ is a higher burden of proof than the "reasonable cause" test. Therefore, it is appropriate for courts to rely on the ALJ's findings and conclusions in evaluating the district court's assessment of the Director's evidence and theories in support of a violation. *See Id. See also Seeler*, 517 F.2d at 37; *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 238 (6th Cir. 2003). Indeed, the "[ALJ's] factual findings are part of the record and cannot be ignored." *J.R.L. Food Corp.*, 196 F.3d at 335.

### 2. The "just and proper" standard

Once reasonable cause is established, § 10(j) relief is "just and proper" where the unfair labor practices threaten to render the Board's processes ineffective by precluding a meaningful final remedy, *see Mego*, 633 F.2d at 1034 (discussing *Seeler*, 517 F.2d at 37–38), where interim relief is the only effective means to preserve or restore the status quo as it existed before the violations, *Seeler*, 517 F.2d at 38, or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint. *Palby Lingerie*, 625 F.2d at 1055. *Accord Silverman v. Major League Baseball Player Relations Comm.*, 880 F. Supp. 246, 255 (S.D.N.Y. 1995), *aff'd*, 67 F.3d 1054 (2d Cir. 1995). In determining whether temporary injunctive relief is "just and proper," courts apply traditional equitable principles and must be "mindful to apply them in the context of federal labor laws." *Kreisberg*, 732 F.3d at 141 (quoting *Hoffman*, 247 F.3d at 368).

21

**C. The District Court Correctly Found There Was Reasonable Cause to Believe Amazon Violated § 8(a)(1) of the Act by Discharging Bryson and that the Board Will Issue a Cease-and-Desist Order**

Amazon does not challenge the district court's reasonable cause finding. (Br. 15.)[6] In any event, the district court correctly found there was reasonable cause to believe Amazon violated the Act by terminating Bryson for engaging in protected concerted activities. First, it properly deferred to the Director's legal theory that *Wright Line* is the correct analytical framework to determine whether Amazon violated § 8(a)(1) when it terminated Bryson. (A135.) *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982), *approved in NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399–403 (1983). To establish a *prima facie* case of discrimination under *Wright Line*, the Director must first demonstrate that: 1) Bryson was engaged in protected activity; 2) Amazon was aware of this activity; and 3) Amazon harbored animus against that activity sufficient to infer that Bryson's protected activity was a substantial or motivating factor behind Amazon's decision to take the adverse employment action. *See Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 683 (2d Cir. 2019); *Electrolux*

---

[6] Although Amazon is not challenging the district court's reasonable cause finding, it calls into question the ALJ's decision (Br. 5–6) and the district court's reliance on and deference to the Director's legal theories and the ALJ's findings. (Br. 12, 19.) Amazon's attacks are without merit. It is well-settled that Second Circuit courts considering the reasonable cause prong of the § 10(j) analysis owe considerable deference to the Director's legal theories and to an ALJ's decision. *See, e.g., Hoffman,* 247 F.3d at 365, 367; *J.R.L. Food Corp*., 196 F.3d at 337.

22

*Home Products*, 368 NLRB No. 34, slip op. at 3 (2019). Proof of discriminatory motivation may be inferred from either direct or circumstantial evidence of animus, including, among other things, evidence establishing disparate treatment, the close timing of the discharge to the protected activity, and the failure to conduct an adequate investigation into Bryson's alleged misconduct. *Transp. Mgmt. Corp.*, 462 U.S. at 400; *Bozzuto's Inc*., 927 F.3d at 683 (citing *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir. 1988)). Once a prima facie case of discrimination has been established, the burden then shifts to Amazon, who must prove, as an affirmative defense, that it would have taken the same adverse action against Bryson even absent his protected conduct. *Bozzuto's Inc*., 927 F.3d at 683. If Amazon's reasons for terminating Bryson are shown to be pretextual then Amazon fails to carry its rebuttal burden. *Abbey's Transp. Servs., Inc*., 837 F.2d at 579.

There is no dispute that Bryson engaged in protected protest activities and Amazon knew of it. Amazon harbored animus against Bryson's activities as shown by the timing of Bryson's termination coupled with Amazon's sham investigation into Bryson's verbal altercation. That Amazon's animus toward Bryson's protected activities motivated its decision to fire him is properly inferred from Amazon's disparate treatment of Bryson relative to Evans and other employees with whom Amazon was more lenient, as well as its bogus investigation. The ALJ's decision,

which the court referenced in its reasonable cause analysis (A69–70), relied on considerable record evidence establishing that Amazon failed to conduct a good-faith investigation into the Bryson-Evans incident. Upon review of the video of the argument and witness testimony, the ALJ concluded that Amazon solicited and obtained "one-sided, exaggerated accounts" of the incident. (A55 n.7.) The ALJ concluded that Amazon's "rush to judgement and skewed investigation" of the altercation established Amazon's discriminatory motive. (A71.) The ALJ also relied on overwhelming evidence of disparate treatment, finding that "[d]isciplinary records do not indicate that [Amazon] has ever discharged an employee for conduct outside the facility on unpaid time. Disciplinary records also show that employees have received discipline short of discharge for conduct similar to or worse than the conduct of Bryson." (A71.) The ALJ found that the evidence establishes that "[Amazon's] stated reason for discharging Bryson was mere pretext for its true discriminatory motive." (A70–71.)[7] Because Amazon's

---

[7] The ALJ also found, in the alternative, that Bryson's discharge was unlawful under *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), because Amazon failed to establish that it had a good-faith belief that Bryson's conduct was a dischargeable offense. (A67–70.) Although Amazon takes issue with how the ALJ conducted the *Burnup & Sims* analysis (Br. 5), the ALJ determined that Amazon engaged in a sham investigation and therefore did not have a good-faith belief Bryson had engaged in serious misconduct, which is a threshold inquiry under *Burnup & Sims*. Accordingly, there is strong cause to believe that Amazon violated § 8(a)(1) even under this alternative theory.

purported basis for its decision to terminate Bryson amounts to nothing more than pretext it cannot meet its rebuttal burden under *Wright Line.* Therefore, there is strong cause to believe Amazon violated § 8(a)(1) when it terminated Bryson, and that the Board will order it to cease and desist from similar illegal actions in the future.[8]

### D. The District Court Properly Concluded that an Interim Cease-and-Desist Order was Just and Proper

#### 1. The district court's interim cease-and-desist order is well-supported by the record and case law

The district court correctly concluded that granting interim relief would both restore the proper status quo and prevent irreparable harm to employees' rights to engage in concerted activities under § 7. Employees have a "clear" right to engage in concerted activities for the purpose of organizing and bargaining through their chosen representatives and to do that "without restraint or coercion by their employer." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 24, 33 (1937).

---

[8] On May 30, 2023, the Board issued a Notice to Show Cause whether the administrative case be remanded to the ALJ in light of the Board's recent decision in *Lion Elastomers LLC*, 372 NLRB No. 83 (2023). In *Lion*, the Board reinstated its traditional "setting-specific" standards for evaluating employee misconduct during protected concerted activity. Here, Bryson's conduct took place outside between two employees during non-work time, was the result of Amazon's failure to provide sufficient COVID safety protocols, both employees traded insults, and Amazon clearly disparately enforced its disciplinary rules. Thus, under *Lion*, Bryson's behavior was not so egregious as to lose the Act's protection and Amazon unlawfully terminated him in violation of § 8(a)(1).

The district court found there was reasonable cause to believe that Amazon violated the Act by unlawfully terminating Bryson for his protected concerted activities (A138, A140), and that finding establishes an initial inference of irreparable harm. *See Palby Lingerie*, 625 F.2d at 1053. *See also Bloedorn*, 276 F.3d at 297–98 (irreparable harm may be inferred from nature of violation, citing *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001)). Indeed, the Second Circuit and other courts have recognized that the discriminatory discharge of an employee activist may effectively chill concerted activities absent interim relief. *See, e.g.*, *Palby Lingerie*, 625 F.2d at 1053; *Pye*, 238 F.3d at 74–75; *Schaub v. W. Mich. Plumbing & Heating, Inc., 25*0 F.3d 962, 971 (6th Cir. 2001). When an employee is unlawfully terminated for engaging in protected concerted activities, the Second Circuit considers that termination a "hallmark" violation of the Act that is "highly coercive." *Murphy v. Hogan Transps., Inc.*, 581 F. App'x 36, 37 (2d Cir. 2014) (citing *NLRB v. Jam. Towing, Inc.*, 632 F.2d 208, 212–13 (2d Cir. 1980)).

If Amazon commits another similar "highly coercive" action in the future, it will likely produce adverse impacts on employees' future collective activities, including bargaining through their Union, like the impacts Bryson's discharge had. Thus, the district court correctly concluded that enjoining Amazon from such future violations is just and proper as "a means for giving employees assurances

that their rights will be protected" and "to ensure that [Amazon] refrains from engaging in unfair labor practices." (A140.)

Given Amazon's swift and drastic response to the early concerted activities of its employees by discharging one of the leaders, the court reasonably concluded that an order prohibiting similar future violations was necessary. As the court correctly noted, similar future violations "might undermine employee organizing and bargaining efforts." (A140.) *See, e.g.*, *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014) (terminating employees for engaging in protected concerted activity reinforces workforce fear of retaliation for similar conduct). The district court was well within its discretion to rely on this inherent likelihood of harm from similar future violations. As noted above, this Court and others have repeatedly recognized the chilling impact that discriminatory discharges predictably have on employee collective activity. *See Id.; Murphy*, 581 F. App'x at 37; *Palby Lingerie*, 625 F.2d at 1053; *Pye*, 238 F.3d at 74–75; *Schaub*, 250 F.3d at 971; *Electro-Voice, Inc.*, 83 F.3d at 1572–73; *Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011); *Sharp v. Webco Indus.*, 225 F.3d 1130, 1135 (10th Cir. 2000). The record evidence that at least some employees were concerned about openly supporting the Union or engaging in protected concerted activities due to Bryson's discharge reinforces the likelihood that future similar violations would have harmful effects, even if the district court found the evidence

27

insufficient or not current enough to warrant Bryson's immediate interim reinstatement.

Amazon has also refused to recognize and bargain with the Union and is challenging the JFK8 election results. The district court's order preventing additional violations offers the best chance to preserve the employees' right to openly engage in protected concerted activities and level the playing field in eventual first-contract bargaining at JFK8 after the election challenges are resolved. *See generally Schaub*, 250 F.3d at 971 (enjoining further unlawful conduct guarantees employees' rights until Board's final decision and maintains status quo). When the Union needs employees to rally in support of its bargaining positions at JFK8 or organize a strike to protest safety concerns, employees will remember that such public activity led to a colleague being fired and that they may meet the same fate. Absent the court's injunction prohibiting similar future discharges, no employee in their "right mind" will step forward to openly show their support. *Silverman v. Whittall & Shon, Inc*., 1986 U.S. Dist. LEXIS 24528, at *2–3 (S.D.N.Y. June 6, 1986). The district court's order, which has been read to employees (Br. 7 n.1), sends a signal to the employees that they may engage in collective activity under the protection of a court order. *See Paulsen v. Remington Lodging & Hosp., LLC*, 2013 U.S. Dist. LEXIS 114628, at *6–7, *41 (E.D.N.Y. Aug. 14, 2013) (order enjoining further unlawful conduct sends signal to

28

employees that rights will be protected and employer will face contempt if order violated), *aff'd in rel. part*, 773 F.3d 462 (2d Cir. 2014).

In contrast to the predictable and likely irreparable harm from similar future violations, the court's interim cease-and-desist order poses no harm at all to Amazon. The district court's "injunction does no more than require [Amazon] to cease its coercive conduct" and, therefore, it poses no "countervailing hardship" on Amazon that outweighs the likely harms to employees in the absence of the order. *Overstreet v. Shamrock Foods Co.,* 679 F. App'x 561, 566 (9th Cir. 2017). Indeed, because the Director established strong cause to believe that Amazon violated the Act, there is no "significant weight" to Amazon's assertions of harm from complying with the law. *Frankl*, 650 F.3d at 1365. Amazon's suggestion (Br. 9– 11) that the mere threat of contempt sanctions for noncompliance makes the injunction order inappropriate has no merit. The risk of contempt sanctions should not be a "talisman" to deny the cease-and-desist order; to give credence to Amazon's argument would mean that no respondent would ever face a § 10(j) order. *Electro-Voice, Inc.*, 83 F.3d at 1573.

The court's interim cease-and-desist order also fulfills the purpose of injunctions under § 10(j) to preserve the lawful status quo. *Remington*, 773 F.3d at 469; *Hoffman*, 247 F.3d at 368 ("One of the underlying purposes of § 10(j) is to preserve the status quo in order to protect employees' statutory collective

29

bargaining rights."). An injunction is appropriate where it preserves the status quo that would otherwise be lost by waiting for a final Board order, rendering the Board's final remedy a nullity. *See Hoffman*, 247 F.3d at 369; *Seeler*, 517 F.2d at 37–38. Absent the court's interim cease-and-desist order, if Amazon were to engage in similar future violations, the adverse impact of such violations on employees' willingness to continue their collective efforts, including bargaining for a first contract, is likely to come to fruition before a final Board order. At that point, with the harm to employees' rights irrevocably complete, the Board's own cease-and-desist order would be "an empty formality." *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967).

Finally, by preventing future violations and protecting the effectiveness of the Board's eventual order, the district court's cease-and-desist order furthers the public interest. *See Frankl*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed . . . ."); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986) ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").

In sum, "the relevant equitable principles," including the balance of harms and the public interest, support the need for the injunction. The district court was well within its discretion to enjoin Amazon from unlawful discriminatory discharges and similar violations pending final Board adjudication. (A140.)

30

### 2.  Cease-and-desist orders are a standard part of § 10(j) injunctions

Contrary to Amazon's suggestion, the court's interim cease-and-desist order is not an improperly wielded "broad sword" nor a "sweeping" misuse of the court's authority. (Br. 14–15, 19.) Rather, orders enjoining future violations to prevent harm to employee rights and preserve the lawful status quo pending Board adjudication are "a standard part of a § 10(j) preliminary injunction." *Paulsen v. PrimeFlight Aviation Servs.*, 718 F. App'x 42, 45 (2d Cir. 2017). *See Kerwin v. Starbucks Corp.*, 2023 U.S. Dist. LEXIS 36784, at *8 (E.D. Mich. Mar. 6, 2023) (interim cease-and-desist orders are "standard," citing *PrimeFlight*, and are "expressly envisioned by § 10(j)"). *See also Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 660 (9th Cir. 2001) (a cease-and-desist order is "[t]he traditional section 10(j) relief.").

Courts sitting in equity to enforce a statute should be guided by the policies enshrined therein. *See Morio v. N. Am. Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980). Under § 10(c) of the Act, if the Board determines that a party has violated the Act, then it "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of this Act." 29 U.S.C. § 160(c). That is, the Board is *required* by the Act to order a party to cease

31

and desist. And, courts can and generally do order under § 10(j) the same interim remedy as the Board will ultimately order in due course. *Morio*, 632 F.2d at 218.

Here, the district court's cease-and-desist order is nearly identical to the ALJ's recommended order, which the Board will consider when deciding to issue its final order. *Compare* A146 (district court order)[9] *with* A74 (ALJ recommended order).[10] Further, the Second Circuit regularly enforces similarly worded Board orders. *See, e.g.*, *NLRB v. Matsu Corp.*, 819 F. App'x 56 (2d Cir. 2020), *enforcing* 368 NLRB No. 16 (2019).

Amazon is simply wrong when it claims that the Board did not present an argument in support of a cease-and-desist order. (Br. 16.) The Board's initial papers (ECF No. 7 at 41), papers updated and resubmitted at the district court's request (ECF No. 45, at 22–23), and the Board's reply brief to the district court (ECF No. 48, at 2–3) all cited the need for an order enjoining Amazon from committing future violations, along with supporting case law. Further, the Supreme

---

[9] The court specifically ordered Amazon to, "(1) [c]ease and desist from: (a) [d]ischarging employees because they engaged in protected concerted activity; and (b) [i]n any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the [Act]."

[10] The ALJ's recommended order to the Board included provisions requiring Amazon to "[c]ease and desist from[:] (a) [d]ischarging employees because of their protected concerted activity[; and] (b) [i]n any like or related manner interfering, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act."

32

Court and other circuits, including the Second Circuit, have stated the need to enjoin a party from committing future violations of the Act when there has been a reasonable cause or other finding of unlawful acts because further violations can be fairly anticipated from past conduct. *See, e.g., NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941); *NLRB v. G&T Terminal Packaging Co.*, 246 F.3d 103, 120 (2d Cir. 2001); *Schaub*, 250 F.3d at 971. *See also Gottfried v. Frankel*, 818 F.2d 485, 496 (6th Cir. 1987) (unlawful conduct need not be ongoing to justify injunction). It is immaterial that the Board has not yet found Amazon to have committed a broad swath of other unfair labor practices because, here, the Board is not seeking a broad "in any other manner" order. (Br. 16.) *See Motion Picture Studio Mechs., Local 52 v. NLRB*, 593 F.2d 197, 200 (2d Cir. 1979) (only when Board seeks broad order enjoining violations "in any manner" is additional evidence of a pattern or plan of illegal activity needed (citing *NLRB v. Int'l Bhd. of Teamsters*, 428 F.2d 994, 999 (2d Cir. 1970))). *Cf. G&T Terminal Packaging Co.*, 246 F.3d at 120 (recidivist employer's previous "substantial and serious violations" warranted broad order); *NLRB v. Hosp. San Rafael*, 42 F.3d 45, 53 (1st Cir. 1994) (employer's failure to rehire five union-adherents sufficiently egregious to warrant broad order that employer cease and desist from infringing "in any other manner" on employees' § 7 rights).

Accordingly, the interim relief granted by the district court was a standard § 10(j) order and well within its discretion to issue.

### 3. The district court's rationale for denying interim reinstatement to Bryson does not weigh against the cease-and-desist order

Contrary to Amazon's contention (Br. 16–17), the fact that the district court found it unnecessary to order Bryson's interim reinstatement does not foreclose the need for an interim order enjoining Amazon from further violating the Act. Courts often weigh the just and proper evidentiary threshold differently based on the type of relief sought. Many ascribe a higher and more specific threshold when considering whether to grant affirmative relief, such as reinstatement or a bargaining order, and have issued orders enjoining future conduct but declined some or all of the affirmative relief sought. *See Fernbach v. Arbor Recycling & Arbor Logistics*, 2017 U.S. Dist. LEXIS 158111, at *15 (S.D.N.Y. Sept. 26, 2017) (ordering cease and desist but declining reinstatement); *Ley v. Novelis Corp.*, 2014 U.S. Dist. LEXIS 123059, at *16–17 (N.D.N.Y. Sept. 4, 2014) (ordering cease and desist and reinstatement but declining bargaining order); *Diaz v. Hartman & Tyner, Inc.*, 2012 U.S. Dist. LEXIS 92459, at *13–14 (S.D. Fla. June 29, 2012) (enjoining future unlawful conduct but declining interim reinstatement), *aff'd*, 714 F.3d 1244 (11th Cir. 2013); *Pascarell v. Candler Coffee Corp.*, 1996 U.S. Dist. LEXIS 21748, at *5 (D.N.J. July 17, 1996) (enjoining further unlawful conduct but denying reinstatement due to egregious employee behavior while noting ultimate

34

question not whether reinstatement proper but whether relief granted will stem chilling effect of employer's unlawful actions); *Garner v. MacClenny Prods.*, 859 F. Supp. 1478, 1483 (M.D. Fla. 1994) (enjoining further unlawful conduct and issuing interim bargaining order but declining reinstatement); *Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249, 253 (D.N.J. 1992) (enjoining further unlawful conduct and issuing interim bargaining order but declining reinstatement).

In this case, given the evidence that Bryson continued to participate in Union activities outside the JFK8 facility and remained visible and accessible to employees long after his discharge, the court had a basis for concluding that his return to the workplace was not immediately necessary and therefore was not just and proper. Moreover, the passage of time since Bryson's discharge and its resulting impact on employees mitigated the need for immediate reinstatement. That there was arguably no pressing need for his reinstatement, however, does not establish that similar future violations would not risk irreparable harm to employees' rights.

Indeed, here, the district court was very discerning when discussing the denial of interim reinstatement, stating that the evidence discussed applied only to "Bryson-specific affirmative relief." (A140–45.) Accordingly, the district court's analysis of why it was not just and proper to order interim reinstatement was specific only to the requested affirmative relief. That analysis does not disturb the

35

court's separate and distinct conclusion that the cease-and-desist order is "appropriate under traditional equitable principles, as applied in [the § 10(j)] context, and will serve to protect Amazon employees' rights pending the final disposition of the case before the Board." (A145.)

As discussed above, pp. 26–29, applicable precedent clearly recognizes the predictable coercive, chilling effect that discriminatory terminations have on employee willingness to openly engage in protected concerted and union activity. The evidence that there was some chilling impact from Bryson's termination reinforces the inference that, absent the court's injunction, future discrimination against employee activists would risk irreparable harm to employees' exercise of their collective rights under the Act. Thus, even if the evidence failed to show an ongoing impact from Bryson's discharge years earlier that was sufficient to warrant his immediate interim reinstatement, the record supports the court's concern that future discrimination would be detrimental and should be enjoined. There is no inherent contradiction in the court's conclusions that Bryson's interim reinstatement was not warranted, but future discriminatory discharges would likely threaten employees' statutory rights and the effectiveness of the Board's final cease-and-desist order.

Accordingly, the district court did not abuse its discretion in issuing a cease-and-desist order despite finding that the evidence did not support a need for Bryson's immediate interim reinstatement.

### E. The District Court's Order Complies with Rule 65(d)

#### 1. The order is sufficiently specific and Amazon can reasonably anticipate from the order what conduct has been enjoined

Rule 65(d) requires "that an injunction . . . be specific and definite enough to apprise those within its scope of the conduct that is being proscribed;" the rule "is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required." *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143, 144 (2d Cir. 2011) (cleaned up). But Rule 65(d)'s requirement that injunctions be clear and specific "does not mean that they must read like the working plans for building hydrogen bombs." *Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013, 1025 (1st Cir. 1995). Instead, the appropriate breadth and specificity of the injunction depends on the circumstances of each case and is guided by the need to prevent violations that are threatened because they are similar to ones already committed, were committed by a recidivist, or were particularly egregious. *See Express Publ'g Co.*, 312 U.S. at 436–37; *G&T Terminal Packaging Co.*, 246 F.3d at 120 (recidivist employer's previous "substantial and serious violations" warranted broad order); *Hosp. San Rafael*, 42 F.3d at 53 (failure to rehire five union adherents sufficiently egregious to warrant

37

broad order). In the § 10(j) context, it is likewise appropriate to prevent threatened

future violations that are similar to the ones that were likely committed, even if not

yet found by the Board, based on a finding of reasonable cause or likelihood of

success. *See Paulsen*, 718 F. App'x at 45; *Scott*, 241 F.3d at 660.[11]

The district court's order specifically enjoins Amazon from: "(a)

Discharging employees because they engaged in protected concerted activity; and

(b) In any like or related manner interfering with, restraining, or coercing

employees in the exercise of the rights guaranteed to them by Section 7 of the

[Act]." (A146.) Rather than instructing Amazon to simply obey the overall Act,

which prohibits a range of unfair labor practices, it enjoins Amazon from illegally

terminating employees for engaging in § 7 activities, as it did Bryson. Thus, the

order is specifically tailored to the violation that the district court found there was

reasonable cause to believe occurred. Further, the order is sufficiently specific

within the bounds of Rule 65(d) by prohibiting like or related conduct. In *Express

Publ'g*, the Supreme Court specifically noted that courts maintain broad authority

to enjoin employers from engaging in "other *related* unlawful acts." *Express

---

[11] These cases and the ones at pp. 31 and 34–35 above, contradict Amazon's
contention that *Express Publ'g Co.* forbids the use of cease-and-desist orders under
§ 10(j) because a final finding of a violation has not yet been made. (Br. 11–12.)
That case did not address cease-and-desist orders under § 10(j) whereas the
overwhelming weight of relevant § 10(j) precedent refutes Amazon's claim.

*Publ'g Co.*, 312 U.S. at 435–36 (emphasis added). *See also Lineback*, 546 F.3d at 506 (affirming district court order enjoining conduct "in any like manner").

Amazon's argument that the cease-and-desist injunction is unwarranted because it "merely directs Amazon to obey the law" misses the mark. (Br. 10.) An order enjoining a party under § 10(j) from engaging in future unlawful acts may appear "superfluous at first blush," but is needed to adequately protect the employees' statutory rights given the court's finding that there is reasonable cause to believe Amazon unlawfully discharged Bryson. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming § 10(j) injunction prohibiting future violations). Amazon's assertion is also unsupported by the cases it cites, which are all distinguishable. (Br. 10–11.). Specifically, Amazon cites the Supreme Court's decision in *Express Publ'g*. (Br. 11.) But that case dealt with the propriety of a broad "in any manner [violates the Act] . . ."-worded Board order. *Express Publ'g Co.*, 312 U.S. at 430. There, the Supreme Court also stated that federal courts may restrain acts of the same types of unlawful actions "whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Id.* at 435. Amazon's citation of *Motion Picture Studio* (Br. 11) is similarly misplaced as it involved an order broader than the one at issue here that was enforced by this Court because of the respondent's documented recidivism. *Motion Picture Studio*, 593 F.2d at 200, *enforcing* 238 NLRB 19

39

(1978). The remaining cases are all distinguishable: *Mickalis Pawn Shop, LLC*, 645 F.3d at 144 (injunction requiring future actions to be "in full conformity with applicable laws pertaining to firearms" impermissible obey-the-law injunction); *Peregrine Myan. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (prohibition against "spurious lawsuits" too vague); *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905) ("or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid," impermissible obey-the-law injunction); *John B. Hull, Inc. v. Waterbury Petrol. Prods., Inc.*, 588 F.2d 24, 30 (2d Cir. 1978) (finding injunction exceeded relief requested and noting injunction may not "enjoin all possible breaches of the law.").

Indeed, this Court has affirmed injunctions and enforced orders with wording similar to the order in the instant case. *See, e.g.*, *Mattina v. Kingsbridge Heights Rehab. & Care Ctr.*, 2008 U.S. Dist. LEXIS 63029, at *92 (S.D.N.Y. Aug. 14, 2008) ("the vast majority of the terms of the proposed injunction simply require [the employer] to cease and desist from engaging in clear violations of the Act -- e.g. ... threatening [e]mployees with discharge if they engage in protected activity ... Such relief is clearly 'proper' insofar as it simply reconfirms [the employer's] existing obligations under Section 8 [of the Act]."), *aff'd*, 329 F. App'x 319 (2d Cir. 2009); *NLRB v. Caval Tool Div., Chromalloy Gas Turbine Corp.*, 262 F.3d 184 (2d Cir. 2001), *enforcing* 331 NLRB 858, 865 (2000)

(ordering employer to "[c]ease and desist from … [i]n any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.").

Amazon is a large, sophisticated employer with competent legal counsel, and can therefore fairly anticipate from the four corners of the district court's order what conduct may expose Amazon to contempt sanctions. *Cf. Peregrine Myan.*, 89 F.3d at 51 (noting that defendant as non-lawyer may have difficulty knowing in advance what district court's order actually prohibits). Indeed, Amazon admitted that Bryson engaged in protected concerted activity under the Act. (A53.) Accordingly, Amazon is aware of the types of protected activities employees can engage in that Amazon may not use as a basis for termination.

### 2. Amazon misconstrues Rule 65(d) in the context of § 10(j) proceedings

Amazon's contention that the district court's order was impermissibly vague in that it merely directed Amazon to comply with the law is contrary to well established legal principles. (Br. 10–11.) Rule 65(d) specifies that a court decree must not be "too vague to be understood," *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), but "Rule 65(d) requires only that acts restrained be described 'in reasonable detail.' It leaves ample opportunity for the application of common sense standards." *U.S. Steel Corp. v. United Mine*

41

*Workers of Am.*, 534 F.2d 1063, 1083 (3d Cir. 1976) (Rosenn, J., concurring). Here, the district court's order, utilizing familiar labor-law terms like "protected concerted activity," "interfering, restraining, or coercing employees," and "Section 7," implicitly incorporated labor law principles developed by the Board and the courts. *See Szabo v. U.S. Marine Corp.*, 819 F.2d 714, 718 (7th Cir. 1987) (Section 10(j) contempt proceeding). The district court "was not required to spell out those principles in the injunction; it was enough that the injunction, by using familiar terms of art, evoked those principles." *Id. See Kerwin*, 2023 U.S. Dist. LEXIS 36784, at *10 (cease-and-desist order not impermissibly vague because order's language that employer not engage in same or similar conduct tracked unlawful conduct that court determined it had reasonable cause to believe occurred).

Thus, as the district court's order was not impermissibly vague, Amazon's concern (Br. 11) regarding contempt is groundless and is not a valid basis for denying relief. Because any company subject to a § 10(j) injunction is theoretically subjected to the risk of contempt sanctions, "[t]he presence of such a risk cannot be the talisman of 'harm' analysis. Otherwise Section 10(j) injunctive relief would never issue." *Electro-Voice, Inc.*, 83 F.3d at 1573.

Amazon further misconstrues the nature of § 10(j) proceedings regarding what findings a district court is to make. Amazon accuses the district court of failing to make an affirmative finding that Amazon violated the Act and appears to

42

fault the district court for not making an "independent determination" of a violation and instead made only a "reasonable cause" finding that "was the product of deference." (Br. 11–12.) This is a fundamental misunderstanding of the district court's role in § 10(j) proceedings. *See Kreisberg*, 732 F.3d at 141 (Section 10(j) injunctions are product of "unique statutory scheme" requiring "deference to the NLRB"). The district court did not make an affirmative or independent finding of a violation because, under Second Circuit law, the court's role is limited to making only a finding of whether there is reasonable cause to believe Amazon committed a violation of the Act. *See* Section V.B.1, *supra* at 19. It is also well-settled in the Second Circuit that the district court is to give considerable deference to the Director's legal theories and an ALJ's decision. *See, e.g.*, *Hoffman*, 247 F.3d at 365; *J.R.L. Food Corp.*, 196 F.3d at 337. Accordingly, Amazon's criticism that the district court's determination was the product of deference only (Br. 12) is misplaced and contrary to this Circuit's law.

Finally, Amazon's contention that the district court's order "permits the Board to end-run the statutory framework" is unavailing. (Br. 13.) Amazon's intimation that the district court "allowed" the Board "to abuse Section 10(j) to accomplish [an] improper result" is wrong and unnecessarily inflammatory. First, as Amazon points out (Br. 14), the Board's processes can take "significant time" and Congress therefore created § 10(j) to avoid potential frustration or nullification

of the Board's remedial authority. *See Seeler*, 517 F.2d at 37–38. Further, the language of § 10(j) appeals to the district court's role as an equitable forum to enforce the Act. "[L]egislative provisions calling for equitable relief to prevent violations of a statute require the courts to act in accordance with traditional equity practice, 'as conditioned by the necessities of public interest which Congress has sought to protect.'" *Morio*, 632 F.2d at 218 (quoting *Seeler*, 517 F.2d at 39–40). Indeed, interim cease-and-desist orders are standard in § 10(j) proceedings and are "expressly envisioned" by the Act. *Kerwin*, 2023 U.S. Dist. LEXIS 36784, at *8 (rejecting employer's argument that interim cease-and-desist order would "short circuit" the Act).

Accordingly, the district court used its considerable discretion to enjoin Amazon from unlawful discriminatory discharges similar to Bryson's and therefore preserve the status quo and prevent irreparable harm to employees' rights until the Board issues its final order. Critically, the fact that the Board does not often seek interim relief under § 10(j) and that such an injunction dissolves as a matter of law upon issuance of a Board order, highlights the baseless accusation that the Board used the district court to do an "end-run" of the Act. *See Johansen v. Queen Mary Rest. Corp.*, 522 F.2d 6, 7 (9th Cir. 1975) (citing *Sears, Roebuck & Co. v. Carpet, L., S.T. & R.F.C. Layers*, 397 U.S. 655 (1970)).

## CONCLUSION

The district court was well within its discretion to issue a standard order enjoining Amazon from further violating the Act. The court's cease-and-desist order is supported by record evidence and applicable law. It prevents harm to employee statutory rights and preserves the status quo until the Board renders its final decision. Further, the district court's order was sufficiently specific and therefore complied with Rule 65(d) because it enjoined only unlawful conduct similar to what there is reasonable cause to believe Amazon committed. Because the district court used familiar labor law terms of art in the order, Amazon can fairly anticipate the type of conduct it is prohibited from engaging in. Accordingly, for the foregoing reasons, the Court should affirm the district court's decision and order.

Respectfully submitted,

/s Chad A. Wallace
Chad A. Wallace
Attorney

Laura T. Vazquez
Deputy Assistant General Counsel

Counsel for Petitioner-Appellee

National Labor Relations Board
1015 Half St., SE
Washington, DC 20570
(202) 273-2489 (phone)
(202) 273-4275 (fax)

Dated at Washington, D.C.
this 28th day of June, 2023

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

this document contains 11,154 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14-point Times New Roman font.

(s)    /s Chad A. Wallace

Attorney for  Teresa Poor

Dated:    June 28, 2023

# ADDENDUM

## Addendum Table of Contents

National Labor Relations Act, 29 U.S.C. § 151 et. seq. ....................................... A-1

Section 7 (29 U.S.C. § 157): .................................................................................. A-1

Section 8(a)(1) (29 U.S.C. § 158(a)(1)): ............................................................... A-1

Section 10(c) (29 U.S.C. § 160(c)): ...................................................................... A-1

Section 10(j) (29 U.S.C. § 160(j)): ........................................................................ A-2

Fed. R. Civ. P. 65(d) ............................................................................................... A-2

## NATIONAL LABOR RELATIONS ACT, 29 U.S.C. § 151 ET. SEQ.

### Section 7 (29 U.S.C. § 157):

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

### Section 8(a)(1) (29 U.S.C. § 158(a)(1)):

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

### Section 10(c) (29 U.S.C. § 160(c)):

. . . If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and

A-1

shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . . .

## Section 10(j) (29 U.S.C. § 160(j)):

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

## Fed. R. Civ. P. 65(d)

(d) Contents and Scope of Every Injunction and Restraining Order.

(1) Contents. Every order granting an injunction and every restraining order must:
(A) state the reasons why it issued;
(B) state its terms specifically; and
(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

(2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:
(A) the parties;
(B) the parties' officers, agents, servants, employees, and attorneys; and
(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

A-2